OF

## THE STATE OF NEW JERSEY.

### FEBRUARY TERM, 1888.

---

ALEXANDER T. McGILL, ESQ., ORDINARY.

---

ABRAHAM V. VAN FLEET, ESQ., VICE-ORDINARY.

---

OPHELIA M. WHEELER and EMMA L. KINGSBURY, appellants.

*v.*

MYRA WHIPPLE, respondent.

The mere fact that the sole beneficiary under a will was the confidential companion and business adviser of the testatrix for several years prior to her death, does not throw the burden of proof upon such beneficiary to show that the will was the spontaneous act of the decedent, where there is no evidence whatever that such beneficiary took advantage of her position and relation to influence the testatrix in her own interest beforehand, or that she participated either in the preparation or execution of the will, or even knew of its existence and contents until some time after it had been made.

---

On appeal from the orphans court of Monmouth county.

*Mr. Frank P. McDermott* and *Mr. E. W. Arrowsmith,* for the appellants.

*Mr. Wm. H. Vredenburgh,* for the respondent.

THE ORDINARY.

This is an appeal from a decree which admits to probate a paper purporting to be the last will of Betsy Ann Kingsbury, who died unmarried at Ocean Grove, in this state, in September, 1886, at the age of sixty-five years.

The disputed paper was executed on the 2d day of June, 1883, and gives the entire estate of the decedent to Myra Whipple, who was Miss Kingsbury's companion for the fifteen years immediately preceding her death.

The appellants were the caveatrices below, and are the nieces and next of kin of the decedent. They claim that the disputed instrument is the product of undue influence which was exercised by Myra Whipple.

It appears that in the year 1871 Miss Kingsbury was ill for several months at a place called Hancock, in the state of New York, with some affection of the brain, and that during that illness was, for many weeks, delirious, and, at times, for days, wholly unconscious. Through her sickness she was cared for by her brother Elisha and his wife, who not only personally attended her, but also provided her with a skilled nurse. As she was convalescing the brother procured Myra Whipple, then a girl fifteen years of age, and the daughter of a cousin, to be her companion and reside with her. From that time till her death, some fifteen years, Myra was Miss Kingsbury's constant companion. In 1880 they moved from Hancock to Deposit, a distance of about twelve miles, and in 1881 they took up their residence in Ocean Grove, in this state. Elisha Kingsbury died in 1875 without leaving issue. By his will he bequeathed to Myra Whipple, because of her kindness to his sister, the sum of $3,000. After Miss Kingsbury and Myra went to Ocean Grove they each purchased a house. That which Miss Kingsbury bought was let to a tenant, and the two ladies thereafter occupied the house which belonged to Myra.

It is in evidence that, at times, after 1871, Miss Kingsbury complained of loss of memory and was somewhat eccentric in

Wheeler v. Whipple.

her behavior, and also that she entrusted Myra with almost all her business affairs, using her as an amanuensis and general adviser.

It is plain that the relations between the two ladies were most intimate and confidential.

While Elisha Kingsbury lived, he managed his sister's investments. After his death, this work was given to William Kingsbury, a cousin, who performed the same services for compensation.

It does not appear that the appellants, who are the children of a deceased brother of Miss Kingsbury, ever paid attention to their aunt in such a way as to secure a place in her affections, or, indeed, that any of Miss Kingsbury's relatives, other than Myra Whipple, took more than a nominal interest in her.

Up to her death, the testatrix was in good health. Her physician says that she died from apoplexy, induced by a cold seabath, which she imprudently took while she was overheated.

The disputed will was drawn by David Harvey, Jr., a member of the bar of this state, of excellent reputation. He says that the instrument was prepared after he had received verbal instructions from Miss Kingsbury, in person, at his office in Ocean Grove; that Miss Kingsbury came alone to the office, and that he made a memorandum of the instructions which she gave him, and from that memorandum, and on the same day, he prepared the will, and took it to her house for execution. Mr. Harvey and George S. Lukins, a neighbor and tenant of Miss Kingsbury, were the testamentary witnesses. In the presence of these gentlemen, she executed the paper with all the formalities which the law required, and at the same time impressed them that she fully comprehended her act, and was competent to make a will. Myra Whipple was not present at the execution of the paper, and is not shown to have had any knowledge that the preparation of such document was in progress or even contemplated.

For the purpose of bearing upon Miss Kingsbury's testamentary intentions, and to show the inclination of Miss Whipple's mind, and the influence that she exercised over her companion,

the appellants introduced, and have attached much weight to, the testimony of three witnesses: Mary Kingsbury, the wife of William Kingsbury, who swore that, prior to 1880, Miss Whipple declared to the witness that she could do almost as she pleased with "Betsy Kingsbury," and that she had induced her to make a will, and, about the same time, that Miss Kingsbury, while at the house of the witness, at Deposit, made a will and then burned a large envelope, saying, as she did so, that she did not wish her money to go into the Whipple family, although she desired that Myra should have the use of something; Mary E. Lukins, the wife of one of the witnesses to the will, who said that, on one occasion when she paid rent for her husband, Miss Whipple explained to her that the receipts for rent were prepared by her, Miss Whipple, because Miss Kingsbury was not capable of doing business; and Sarah E. Calder, a cousin who lived at Ocean Grove, and testified to the effect that she advised Miss Whipple, on the night after Miss Kingsbury's death, not to use money or anything in the house, because it must be accounted for, and was told by Miss Whipple, in reply, that Betsy had made a will, which she supposed was in her favor.

There is no direct proof that any influence was exerted to produce the paper in dispute. The appellants' case confessedly rests wholly upon the inferences which must necessarily be drawn from the facts which are established. They claim that it is shown that Miss Kingsbury was in an enfeebled condition of mind, and that the relations between her and Miss Whipple were of the closest and most confidential kind, and that these circumstances, with others, are of such force that the burden is thrown upon the respondent to show that the will was the spontaneous act of the testatrix, and that her failure to assume and successfully bear this burden is fatal to the validity of the disputed instrument.

I cannot assent to this position. The proofs do not satisfy me that the testatrix was not of sufficient mental strength and will to make the instrument in question as she pleased. The relationship to Miss Whipple was close and undoubtedly confidential, such as would be likely to result from an association and com-

panionship for years.    But why should such a relationship militate against the validity of this will?    I fail to find authority, either in precedent or reason, for discouraging such a companionship by placing an undue burden upon one who shall reap its natural and legitimate fruits.

Among the cases in which the burden of proof has been thrown upon the beneficiary under a will, I do not find one in which confidential relationship with the testator was the sole element which influenced the decision.    In such cases, added to proof that the testator's mind was enfeebled so that it was difficult to resist improper influence, and the establishment of intimate confidential relationship, there has usually been some other element, such as the initiation of proceedings for the preparation of the instrument, or participation in such preparation by the employment of a draughtsman, the selection of the witnesses present at the different stages of the proceedings, and the like, or an effort to exclude the natural objects of the testator's bounty from his society, or to conceal the making of the will or the instrument itself after it has been made.

The case in hand does not present an element of this kind.    It is not shown that Miss Whipple even knew that Miss Kingsbury had the making of the will in contemplation at the time it was prepared, nor is it proved that she ever excluded from the testatrix any relative or friend who might desire to be with her. On the contrary, it appears that, both before and after the will was made, Miss Kingsbury alone made several visits to her relatives at Hancock and Deposit.    Nor does it appear that an effort was ever made to conceal the existence of a will.

That which was said by Miss Whipple to Mary Kingsbury was a boast that would hardly have been indulged in by one whose mind was bent upon unfair purposes.    The remark to Mrs. Lukins was without significance, in view of the evidence that the testatrix was a tailoress without education, and the reply to Mrs. Calder signifies nothing more than that, after the will had been made more than three years, Miss Whipple knew that such a document existed, and had reason to believe that she was to benefit by it.    It was not only natural that Miss Kingsbury

should have told her of the paper, but also natural that she should expect to take under it. She was the natural object of Miss Kingsbury's bounty, being bound to her by both love and long companionship. I have no difficulty in reaching the same conclusion that the orphans court did, and I will therefore affirm the decree of that court, with costs.