OF

## THE STATE OF NEW JERSEY.

## 1915.

---

EDWIN ROBERT WALKER, ORDINARY.

JOHN R. EMERY, FREDERIC W. STEVENS, EUGENE STEVENSON,
EDMUND B. LEAMING, JAMES E. HOWELL, VIVIAN M.
LEWIS, JOHN H. BACKES AND JOHN GRIFFIN,
VICE-ORDINARIES.

---

In the matter of the last will and testament of THOMAS D.
SEBRING, deceased.

[Submitted February 23d, 1915.  Decided March 11th, 1915.]

1. Counsel fees and costs will not be allowed out of a decedent's
estate to an unsuccessful contestant of a will whenever he ventures
beyond an exploration of the attesting witnesses, unless he had reason-
able cause for believing that the paper-writing offered for probate was
not the last will and testament of the deceased, and this belief must be
shown to have rested upon facts or circumstances sufficient to excite in
the probate court an apprehension that the testator lacked mental
capacity or was unduly influenced.

2. Evidence *Held* to fail to show that the probate court was justified in imposing upon the estate the fees and costs of the caveatrix who contested the will on the ground of undue influence, alleged to have been exercised by her mother over the testator.

3. Undue influence defined.

*Mr. H. Burdell Herr,* for the appellant.

*Mr. Willard C. Parker* and *Mr. George H. Large,* for the appellee.

BACKES, VICE-ORDINARY.

This is an appeal from so much of the decree of the orphans court of Hunterdon county admitting to probate the last will and testament of Thomas D. Sebring, deceased, as allow costs and counsel fees to the caveatrix.

Chancellor Green, in *Perrine* v. *Applegate (1862), 14 N. J. Eq. 531,* quoted authorities showing the then general rule to be that where the will is admitted to probate, costs are not to be paid out of the estate of the testator to the party contesting the grant of probate, and also that where probate is refused to one other than an executor, the unsuccessful party will be condemned in costs. The chancellor had under consideration the effect of section 12 of the supplement to the Orphans Court act, approved March 17th, 1855 (*Nix. Dig. 651*), and of section 1 of the supplement of February 1st, 1861 (*Nix. Dig. 656*), the first of which provided that if probate be refused, costs were to be awarded as theretofore, but if probate was granted, the costs of both parties were to be paid by the contestant, if he introduced at the trial evidence of others than the subscribing witnesses; and the second, that if such other evidence were introduced, and it appeared that the contestant had reasonable cause for contesting the will, costs were to be allowed as they were allowed prior to the act of 1855. And he held that the first enactment was little else than a legislative recognition of the correct practice of the court, and that the later one simply gave to the court the discretion which it formerly exercised, and remarked that "it must be an extreme case that would justify a court in giving costs to

an unsuccessful party in contesting a will." The practice rested upon the principle that an heir or next of kin who adopted this form of litigation for his own private gain and benefit, if unsuccessful, must, like suitors in any other forms of action, pay the costs. The two acts were in substance incorporated in section 169 of the Revision of the Orphans Court act of 1874 (*Rev. Stat. 1874 p. 550*), which was amended in 1876 (*Rev. p. 791*), by adding the provision that if it appeared to the court that there was reasonable cause for the contest, it may order the costs and expenses of the caveator to be paid out of the estate of the deceased. As amended, it was re-enacted in section 197 of the Revision of the Orphans Court act of 1898. *3 Comp. Stat. p. 3885*. This modification of the practice did not alter the prevailing rule in imposing costs in the court's discretion, and now, as then, it must appear that the unsuccessful contestant, whenever he ventures beyond an exploration of the attesting witnesses, had reasonable cause for believing that the paper-writing offered for probate was not the last will and testament of the deceased, and this belief must be shown to have rested upon facts or circumstances sufficient to excite in the probate court an apprehension that the testator lacked mental capacity or was unduly influenced before the court will favor him in costs. This requirement of minimum proof works no hardship upon the contestant and affords some protection to the estate from speculative and vexatious litigation.

I have examined the record in this case with anxious care, to find something upon which the court below was justified in imposing upon the estate the fees and costs of the caveatrix, but without success. The disputed will was made in 1899, when the testator was a man in the forties, in vigorous health, and of sound mental balance. His family then consisted of his wife and daughter, the latter about sixteen years of age. By his will he gave $200 to his half-sister, and the balance of his estate to his wife, whom he nominated as executrix. The testator died in 1914, nearly fifteen years afterwards. His mental capacity is not assailed, but the daughter contested the will on the ground of undue influence alleged to have been exercised by her mother. About two months before the will was made, the daughter eloped,

causing both parents great sorrow, not unmixed with bitter feeling towards the daughter, which, perhaps, moved the testator to ignore her in his will. This is mere conjecture, as the disposition of the estate to the wife was quite natural, and the evidence is silent as to the testator's motive. The sorrow and bitterness of feeling of the parents was keener in the mother than the father. He was of an even and easygoing disposition, and inclined to relent. The daughter, on the other hand (who, after her marriage, lived within a mile or two of her parents), made no efforts to become reconciled, and the estrangement continued down to the father's death. Testimony was offered, tending to show that long after the will was made, and probably after the deceased joined church, he hoped and wished for a reunion with his daughter, and also tending to show that the mother's sorrow and anger were so deep-rooted that she regarded the daughter as dead, and upon one or more occasions stated that the daughter would not get any of their property, and expressed satisfaction with the way her husband had cut her off in his will. The testimony also shows the mother to be a woman of strong will and firm determination, while the testator, although admitted to have been mentally sound and level-headed, was of a more pacific and yielding nature. No testimony was produced to show, even faintly, that the wife exercised an influence, lawful or unlawful, upon her husband to make his will in her favor, and the contestant's case rested solely upon an impossible inference of undue influence sought to be deduced from a greater degree of strength of mind in the wife than in the husband, and from circumstances which grew out of the conduct of the caveatrix. "Undue influence consists in the destruction of free agency. Whatever constrains a person to do what is against his will, and what he would not do if left to himself, is undue influence, no matter by what means the control is exercised. The extent or degree of the influence is wholly immaterial, for the test is, was the influence, whether powerful or slight, sufficient to destroy free agency, so as to make the act brought in judgment the act of another rather than the expression of the mind and heart of the actor?" *Carroll* v. *Hause, 48 N. J. Eq. 269* (at *p. 273*).

The testimony in no sense meets this definition, and the caveatrix could not, in reason, have believed that it would. In such circumstances, to imburse the caveatrix to enable her to pay her counsel, or to reimburse her for such outlay, would be to revive the old practice denounced by the chancellor in *Perrine* v. *Applegate, supra,* in the following language: "Previous to the act of 1855, a practice obtained in at least some of the counties of the state, in all litigated cases, of charging the entire costs of contesting the validity of wills of both parties upon the estate. There is no legal justification for such practice. It affords an easy mode for a disappointed heir to thwart the intentions of the testator by squandering the estate in litigation, or compelling the legatees to accede to unreasonable terms of settlement. Instances are not wanting where entire estates have been swept away by protracted litigation. It is, in fact, a bounty upon litigation. I speak but the common sentiment of the profession in saying that the practice was fraught with great evils and operated most oppressively upon legatees."

The appeal will be sustained, with costs.