**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1716-23

IN THE MATTER OF THE
ESTATE OF EMILIE L. PETTY,
deceased.

_____

Submitted April 2, 2025 – Decided June 27, 2025

Before Judges Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Warren County, Docket No. P-20-000522.

Lanza & Lanza LLP, attorneys for appellant Gregory Petty (John E. Lanza and Robyn D. Wright, on the briefs).

Russo Law Offices, LLC, attorneys for respondents Irene Dalton and Eric Dalton (Brad M. Russo, on the brief).

PER CURIAM

Appellant Gregory Petty[1] filed an order to show cause (OTSC) and verified complaint, seeking to invalidate his mother's July 2020 and August 2020 wills, claiming undue influence and diminished capacity. Appellant appeals from the trial court's January 16, 2024 order denying his fee application made pursuant to Rule 4:42-9(a)(3). Because we determine there was no abuse of discretion in the court's finding appellant lacked a reasonable basis to challenge decedent's wills and was therefore not entitled to attorney's fees from decedent's estate (the estate), we affirm.

I.

A.

Background of the Petty Estate

The following facts and procedural history relevant to our review of the fee determination are derived from the record. Decedent Emilie L. Petty owned approximately thirty acres of land in Phillipsburg, which she purchased in 1975 with her husband. In 1988, decedent gifted parcels of that land to her eldest son, Peter Petty (Peter). Appellant and Peter had a long history of tension surrounding who would farm certain portions of the thirty-acre land. Appellant

---

[1] As certain parties share a common last name and intending no disrespect, we refer to them in this opinion by their first names.

A-1716-23

testified at his deposition regarding the tumultuous history, stating he argued with his brother "[e]ssentially every night, every interaction [they] had," beginning when his family purchased the farm.

This tension culminated in appellant's filing a lawsuit against Peter in 1988 when a dispute arose in which Peter allegedly "kill[ed] [appellant's] cattle," after which, appellant's family, including decedent, stopped speaking to appellant. Days after filing the lawsuit, appellant shot and killed Peter. The parcel of land that Peter received from decedent was eventually sold after his death.

Appellant pled guilty to the homicide and served seven years in prison after being sentenced to twenty years' imprisonment. According to appellant, decedent visited him in prison, although he could not recall their discussing the homicide.

In 2001, decedent gifted appellant and his wife approximately seven acres of land, on which appellant built a house within walking distance of decedent's house. Although appellant testified that he "had a very good relationship" with decedent after returning home from prison, he admitted that he never assisted her with grocery shopping, cooking, or maintaining the yard in the last year of her life.

3

In 2009, decedent and her husband executed mutual wills (the 2009 will), leaving their land equally to appellant, appellant's son Scott, Peter's daughter Sueanne L. Dugan, and decedent's granddaughter Sarah.

Sueanne moved in with decedent in 2013 and approximately one year later, decedent's husband died. According to Sueanne, she had no knowledge that she was "a [twenty-five] percent beneficiary of [decedent's estate]" pursuant to the 2009 will.

July 2020 Will

Appellant testified that in the year prior to decedent's death decedent requested that he come to her house to have a conversation, as "she was bedridden," and when they spoke, she advised appellant "she was thinking of leaving [her] house to Sueanne." He recalled saying, "You can leave it to whoever you like. . . . I would hope that you would let me have the land." He did not remember what decedent said in response. Appellant testified that decedent also advised "[his] brother Peter told her that if the [w]ill goes as it is, . . . the barn w[ould] have to be sold because nobody w[ould] be able to afford to buy the others out." Appellant recalled responding, "My brother Peter has been dead for over [thirty] years, mom."

4

Nancy Russo, the attorney for decedent's estate, testified at her deposition that in early 2020, decedent contacted her by phone and advised "she wanted to transfer her property to Sueanne," in fee simple. Russo further testified the phone call "about the potential change to her will" lasted approximately ten minutes, and she recalled taking notes from their conversation, but could not recall what happened to the notes.

On July 31, 2020, Russo and her legal secretary, Geraldine Light, went to decedent's house, at decedent's request, and reviewed a will prepared by Russo in advance based on their earlier conversation. Decedent executed the will, bequeathing her home to Sueanne and splitting the remaining land in five equal shares between appellant, Scott, Sueanne, Sarah, and decedent's daughter-in-law, Elisa Beers. With respect to decedent's condition at the time, Russo testified decedent appeared "fine," was "responsive to [Russo's] questions," and did not appear "sick."

Russo testified that she reviewed the draft will with decedent and after reviewing and reading the entire document, decedent signed the first and second page in Russo's and Light's presence. Russo and Light executed the will as witnesses, and decedent paid Russo by way of a check for her legal services. According to Russo, Sueanne was at the house caring for children in another

A-1716-23

room and "was coming in and out of the" kitchen where decedent and Russo were reviewing the will.

By contrast, appellant testified at his deposition that in "[t]he last few months of [decedent's] life, she never left her bedroom." He described her as incontinent and unable to "talk very coherently. She rambled on and on about stuff that didn't make sense."

August 2020 Will

Russo testified that approximately one month later, decedent contacted her by phone to report a typographical error in Elisa's surname as it appeared in the will. This prompted Russo to draft a new will, with all provisions remaining identical, correcting only the misspelled name.

On August 28, 2020, Russo and Light returned to decedent's house to review the new will (the August 2020 will). Russo testified that decedent was in bed when they arrived, and she appeared "[t]ired," but responsive to her questions. She did not recall Sueanne's being present at the house on August 28, contrary to Sueanne who testified that she was present, in the room when Russo met with decedent. Sueanne also testified that she "h[eld] the form for [decedent] to sign," and indicated that decedent's signature appeared different from her signature on the July 2020 will due to decedent's "hand tremor" and

Sueanne's "not standing straight" while holding the form. She acknowledged that Light signed as a witness to the August 2020 will, although she could not recall whether Light was in the room at the time the will was signed.

Russo recalled reviewing the correction with decedent and explained the entire meeting lasted approximately fifteen minutes. This was the last interaction Russo had with decedent before decedent suffered a stroke on September 2, 2020, and died a week later.

Sueanne testified that decedent had heartburn, diabetes, depression, anxiety, and high blood pressure and took medication, including "Metformin[,] Lisinopril," "Prozac, Prilosec, Xanax as needed, and Zofran." However, Sueanne testified that she "never thought [decedent's] health was failing," until she suffered the stroke on September 2.

Decedent's sister, Irene M. Dalton, co-executor of the estate, prepared a certification describing her conversations with decedent regarding appellant and decedent's condition prior to her death. She stated that despite appellant's living "a mere [200] to [300] feet from [decedent], [appellant] only stopped by to visit his mother infrequently," and she recalled decedent expressing "that she did not want [appellant] to have the family house and farmland," but rather, "wanted to leave her home and farmland to . . . Sueanne."

7

Irene explained that she and her son Eric J. Dalton, co-executor of the estate, "ha[d] no financial interest in the [e]state" and that decedent "wanted [her] and Eric . . . to serve as [c]o-[e]xecutors for the sole purpose of defending her [e]state against a contest by [appellant]." With respect to decedent's condition prior to her death, Irene certified that decedent "was of sound mind," noting that although "she had difficulty ambulating," decedent "was still reading several books a week and completing word scrambles on her Kindle. Her memory was also very sharp."

B.

<u>The Estate Litigation</u>

Approximately five months later, appellant filed an OTSC and verified complaint, seeking to invalidate his mother's July 2020 and August 2020 wills. Appellant alleged Sueanne unduly influenced decedent, and decedent's "physical and mental condition impaired her to the point that she was not a person of sound mind capable of disposing of her estate." Appellant sought to have the August 2020 will set aside and requested a formal accounting of the estate.

The Surrogate entered an OTSC on February 8, 2021. Co-executors/defendants Irene and Eric filed an answer on behalf of the estate.

8

Sueanne filed an answer as well. Over the next year, written discovery requests were made, but when appellant retained new counsel in May 2022, no discovery had been exchanged, and the court entered four case management orders extending discovery deadlines and held seven case management conferences. In its August 12, 2022 case management order, the court noted the parties agreed to extend the discovery deadline to exchange written discovery no later than September 12.

After four additional case management conferences between September 2022 and January 2023, and an unsuccessful attempt at resolving their dispute in February 2023, appellant filed a motion to amend his complaint to assert "scrivener error" and to reopen discovery to complete additional depositions. The court heard oral argument and granted appellant's motion to reopen discovery to allow for completion of fact and expert witness depositions.

Appellant's First Motion and Request for Fees

After the completion of depositions, on September 1, 2023, appellant filed a motion to establish a presumption of undue influence and shift the burden of proof to defendant to rebut the presumption, asking the court "to find reasonable cause to challenge [the July 31, 2020 and August 28, 2020] wills under [Rule]

9

4:42-9(a)(3)." Appellant also sought an "award of attorney[']s[] fees." The estate opposed the motion.

Appellant argued he had established "a prima facie standard of undue influence," by demonstrating a confidential relationship existed between decedent and Sueanne involving "suspicious circumstances." In support of his claims, he argued decedent was "immobile, . . . reliant, and dependent upon the people . . . she live[d] with, who happened to benefit from the will change, which is a drastic departure from a longstanding estate plan." Appellant argued "the primary beneficiary shoved underneath the [decedent's] hand for her to sign" "the will . . . submitted for probate," which was the "grossest case of undue influence you could possibly think of" and there were contradicting statements made by Russo and Sueanne about whether Sueanne was present at the time decedent executed the will. Appellant argued these facts "suffice[d] to shift th[e] burden" and to award counsel fees from the estate to appellant.

Counsel for the estate argued in opposition that it was "undisputed what . . . decedent's wishes were," citing Irene's certification, Russo's testimony, and Sueanne's testimony. He further argued the change to the original will was "not a drastic change," noting the July 2020 will changed appellant's share of the residual estate from twenty-five percent to twenty percent. Moreover, he

10

argued the adjustment "[wa]s not in isolation. This [wa]s a woman who had lost her other son at the hands . . . of [appellant]." He cited appellant's own testimony regarding the property-related disputes with his brother, appellant's admission that decedent advised appellant she "want[ed] to leave the house to Sueanne," and appellant's response, "It's your house, you can do what you want." Critically, the estate argued that appellant failed to present decedent's medical records to establish any purported cognitive issues.

With respect to attorney's fees, the estate asserted appellant's motion was premature and should have been "made after a fully developed record at trial once the [c]ourt kn[ew] what its decision [wa]s going to be and why," and only then should the court address the scope of attorney's fees and "equitable concerns about shifting the attorney fee burden in a matter like this."

Following oral argument on October 2, 2023, the court, by order and written decision, denied the requested relief without prejudice, concluding a confidential relationship existed between decedent and Sueanne, finding "[d]ecedent relied entirely on Sueanne and Elisa . . . to assist her with activities of daily living." However, the court denied the motion, indicating it engaged in "a fact-sensitive analysis, . . . taking into account all the evidence presented," and found "insufficient grounds to find suspicious circumstances to shift the

11

burden." The court was "not satisfied that the circumstances or indicia of circumstances [we]re strong enough to raise a presumption of undue influence." The court acknowledged Russo provided "less than meticulous legal services" and that "it was certainly not good practice to have Sueanne . . . hold the August 2020 [w]ill for decedent when she signed it on August 28, 2020," however, Sueanne could not "be charged with those sloppy practices." The court noted the evidence demonstrated "decedent's desire to leave her house and real property to Sueanne . . . was well-known to Irene . . . and even [appellant]."

Ultimately, the court found "[p]laintiff's evidence presented to the court [wa]s shaky and d[id] not even skim the surface of what would be considered suspicious circumstances attributable to the proponent of the 2020 [w]ills." Although it deemed the execution of the corrected August 2020 will "irregular and less than ideal," the execution of the July 2020 will, making the substantive changes to the bequests, was "standard." Therefore, the court denied appellant's motion to shift the burden and application for counsel fees as "premature," citing Rule 4:42-9(a)(3), concluding "[p]laintiff's application [wa]s not yet ripe," and "[t]he reasonableness of [appellant's] will contest c[ould] only be determined at the close of testimony and after documents are moved into evidence."

Appellant did not seek leave to appeal the court's decision, and instead withdrew his complaint with prejudice, reserving the right to seek attorney's fees, which was memorialized in a consent order dated October 24, 2023. Consequently, the August 2020 will was admitted to probate.

Appellant's Subsequent Motion for Fees

On November 30, 2023, appellant filed a second application for fees. Specifically, appellant sought $69,535.19 in counsel fees, reiterating the same arguments he raised in his initial application, but adding that "had this case gone to trial, [appellant] would have been entitled to an adverse inference" because Russo's notes related to the will signing no longer existed. He argued reasonable cause existed to contest the will and the fee request was reasonable based on his counsel's hourly rate "accepted by courts in th[e] vicinage for years." Appellant's counsel argued he "was not afforded courtesies that are typically given to any lawyer [who] does this practice," including having to argue for extensions of discovery after he substituted in as counsel and that "cost [appellant] money." Appellant blamed defendants for the two-year delay in discovery, claiming defendants sought adjournments of the early settlement panels "most of the time[]."

The estate characterized appellant's claims as self-serving statements "cultivated by . . . [p]laintiff and presented to the [c]ourt in the light most favorable to [him]." The estate emphasized that appellant's requests to extend discovery after two years and appellant's decision "to fire his attorney and bring in a new attorney" after two years delayed the proceedings.

On January 16, 2024, the trial court issued an order and written decision denying appellant's motion. The court concluded the facts appellant cited as a "reasonable basis to challenge the 2020 [w]ills"—namely that (1) decedent was bedridden; (2) Russo "did not explain the changes to the will to decedent"; (3) Sueanne was in the room with decedent when she executed the will and held it while decedent signed; and (4) Light was not in the room or in decedent's home when decedent executed the August 2020 will, which merely corrected a typographical error. Therefore, the court found appellant's attempt to "bootstrap the circumstances of the August . . . 2020 [w]ill signing to the July . . . 2020 [w]ill [wa]s disingenuous and improper." Again, reviewing appellant's testimony, the court emphasized appellant's claims were limited to having a "'gut feeling' . . . and nothing more."

The trial court described appellant's complaint as "built on shaky assumptions that did not have the strength to go to trial," and found his

14

"emotional attachment to the property," without more, could not "serve as a reasonable basis to grant nearly $70,000 in counsel fees, which would drain the [e]state." It further pointed out that the estate paid executor's counsel $37,233.11 to defend the will contest leaving only $49,227.63 in available assets. Therefore, the trial court determined "[t]o force a sale of the property or pull equity from the property would undermine the undisputed intent of the decedent as expressed in the 2020 wills."

## II.

### A.

Appellant appeals from the January 16, 2024 order and seeks a remand "to determine the amount [p]laintiff should receive," arguing preliminarily that "the trial court wrongfully denied [his] motion to shift the burden of proof by resolving factual disputes in [d]efendants' favor, failing to acknowledge [p]laintiff's evidence of suspicious circumstances, and requiring a higher level of suspicious circumstances than required under the law, among other issues."

At the outset, we observe that appellant's notice of appeal is confined to the order denying his second motion seeking attorney's fees. Rule 2:5-1(f)(2)(ii) provides that the notice of appeal "shall . . . designate the judgment, decision, action, or rule, or part thereof . . . from . . . which the appeal is taken."

Therefore, "only the judgments or orders or parts thereof designated in the notice of appeal . . . are subject to the appeal process and review."  Pressler & Verniero, Current N.J. Court Rules, cmt. 6.1 on R. 2:5-1 (2024); see also Campagna v. Am. Cyanamid Co., 337 N.J. Super. 530, 550 (App. Div. 2001).

The estate contends that appellant is "procedurally barred from collaterally attacking the trial court's October 3, 2024 order denying his motion to shift the burden at trial," decided prior to his voluntary dismissal of his complaint with prejudice and subsequent motion seeking attorney's fees, as he "had a full opportunity to present any and all evidence favorable to him in his motion to 'shift the burden.'"  Therefore, the estate argues "without reconsidering the denial of his motion to shift the burden or seeking an appeal, . . . [p]laintiff cannot now dispute the factual and legal findings comprising the October 3[] [o]rder."

Indeed, appellant never appealed from or sought reconsideration of the trial court's substantive decision on the motion to shift the burden of proof regarding undue influence; instead, he voluntarily dismissed his complaint with prejudice.  Accordingly, we decline to review the merits of his procedurally barred arguments challenging the court's substantive motion decision.

16

However, because appellant preserved the right to apply for reimbursement of his counsel fees from the estate, we reference the record and the motion decision to the extent necessary for review of the court's January 16, 2024 decision denying appellant's motion for attorney's fees.

B.

In a will contest, the award of counsel fees and costs under <u>Rule</u> 4:42-9(a)(3) is discretionary.  <u>See</u> <u>In re Reisdorf</u>, 80 N.J. 319, 327 (1979).  The <u>Rule</u> provides :

> In a probate action, if probate is refused, the court may make an allowance to be paid out of the estate of the decedent.  If probate is granted, and it shall appear that the contestant had reasonable cause for contesting the validity of the will or codicil, the court may make an allowance to the proponent and the contestant, to be paid out of the estate.
>
> [<u>R.</u> 4:42-9(a)(3).]

"[F]ee determinations by trial [judges] will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion."  <u>Packard-Bamberger & Co. v. Collier</u>, 167 N.J. 427, 444 (2001) (quoting <u>Rendine v. Pantzer</u>, 141 N.J. 292, 317 (1995)).  "While deference will ordinarily be given to discretionary decisions, such decisions will be overturned if they were made under a misconception of the applicable law."  <u>O'Neill v. City of Newark</u>, 304

N.J. Super. 543, 550 (App. Div. 1997). When the decision turns on a question of law that flows from established facts, the trial judge's decision is not entitled to any deference, and appellate review is de novo. See Dempsey v. Alston, 405 N.J. Super. 499, 509 (App. Div. 2009).

"Except in a weak or meretricious case, courts will normally allow counsel fees to both proponent and contestant in a will dispute." Reisdorf, 80 N.J. at 326. Unsuccessful will challengers are entitled to costs when they show "reasonable cause" for bringing a probate challenge, defined as a belief that "rested upon facts or circumstances sufficient to excite in the probate court an apprehension that the testator lacked mental capacity or was unduly influenced." In re Will of Caruso, 18 N.J. 26, 35 (1955). This requirement "works no hardship upon the contestant and affords some protection to the estate from speculative and vexatious litigation." Ibid. (quoting In re Sebring's Will, 84 N.J. Eq. 453, 455 (Prerog. Ct. 1915)).

There is a presumption that a will's "testator was of sound mind and competent when he executed the will." In re Livingston's Will, 5 N.J. 65, 71 (1950). However, if the execution of the will was "tainted by 'undue influence,'" it may be overturned. Haynes v. First Nat'l State Bank of N.J., 87 N.J. 163, 176 (1981); see also Livingston's Will, 5 N.J. at 76. "[U]ndue influence is a mental,

18

moral, or physical exertion of a kind and quality that destroys the free will of the testator by preventing that person from following the dictates of his or her own mind as it relates to the disposition of assets." In re Est. of Stockdale, 196 N.J. 275, 302-03 (2008). However, "[n]ot all influence is 'undue' influence." Livingston's Will, 5 N.J. at 73. "It denotes conduct that causes the testator to accept the 'domination and influence of another' rather than follow his or her own wishes." Stockdale, 196 N.J. at 303 (quoting Haynes, 87 N.J. at 176).

"Ordinarily, the burden of proving undue influence falls on the will contestant." Ibid. However, "if the will benefits one who stood in a confidential relationship to the testator" and that "confidential relationship" is "coupled with suspicious circumstances, undue influence is presumed and the burden of proof shifts to the will proponent to overcome the presumption" by a preponderance of the evidence. Ibid.; see also Haynes, 87 N.J. at 177-78.

Appellant contends the trial court mistakenly rejected his claim of suspicious circumstances and employed an incorrect legal standard, arguing this alleged error "influenced its later decision denying attorney's fees on the ground that [p]laintiff had a weak case." According to appellant, he had "well-founded doubts that the wills truly reflected his mother's intention, and reasonable cause for investigation based on . . . all the facts and circumstances."

He further contends the trial court "refused to consider whether . . . suspicious circumstances surrounding the August 2020 [w]ill justified reasonable grounds for a will contest, instead treating that will as irrelevant." Appellant argues the August 2020 will, by itself, justified a will contest, relying on the uncontested facts that decedent "was so ill that she remained in bed" when she executed the August 2020 will, "had a hand tremor when she signed the will," and had a stroke days later resulting in her death. He also referenced decedent's medications, speculating that "the undisputed facts support an inference of a much more serious condition." He further contends the court misapprehended the extent to which the estate distribution changed pursuant to the July 2020 will.

These arguments, couched in terms of counsel fees, seek to attack the court's underlying substantive determination that appellant's will contest was rooted in emotion and speculation. As discussed, that order is not before us. What is before us is ample evidence supporting the court's denial of counsel fees.

Appellant's assertions of his mother's immobility and medical ailments, coupled with Sueanne's presence at the execution of the August 2020 will—altered only to correct an inconsequential typographical error—do not render the

judge's detailed rejection of appellant's suspicious circumstances claim and related fee determination an abuse of discretion. We are satisfied the court conducted a fact-specific analysis of a record the court credited as showing appellant shot decedent's son Peter over this land, decedent told appellant she wished to revise her will to leave her home to Sueanne who had cared for her, both Irene and Russo averred to decedent's sound mental state and desire to revise her will, and the August 2020 will corrected a quintessential "typographical error" in the last name of one of the beneficiaries, detected and raised by decedent herself. The record also contained Irene's sworn certification that decedent specifically appointed her as executor to defend her wishes should appellant contest the estate's distribution.

Here, the trial court described its reasons for finding appellant's complaint was "built on shaky assumptions that did not have the strength to go to trial" and his "emotional attachment to the property," without more, could not "serve as a reasonable basis to grant nearly $70,000 in counsel fees, which would drain the [e]state." The court thoroughly reviewed the deposition testimony, noting appellant's claim of undue influence was, by his own language, based upon "gut feeling[s]." Appellant's argument that the August 2020 will, by itself, justified a will contest, completely disregards the trial court's decision that, even

21

assuming the August 2020 will was "suspicious," the facts relied upon by appellant do not apply to the July 2020 will, which was substantively identical to the August 2020 will, merely correcting a typographical error.

Therefore, we conclude the court did not misuse its discretion in finding appellant lacked reasonable cause for contesting the validity of decedent's will. We similarly find the court's denial of counsel fees firmly rested in credible evidence in the record. The court carefully considered the attorney fee application, noting the estate paid executor's counsel $37,233.11 to defend appellant's "meretricious lawsuit," leaving $49,227.63 remaining in the estate. It correctly applied the law and reasonably concluded that "[t]o force a sale of the property or pull equity from the property would undermine the undisputed intent of the decedent as expressed in the 2020 wills."

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1716-23